**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| ZENWORK, INC.,<br><br>         *Plaintiff*,<br><br>    v.<br><br>UNITED STATES SOCIAL SECURITY ADMINISTRATION,<br><br>AND<br><br>CAROLYN W. COLVIN, in her official capacity as Acting Commissioner of Social Security<br><br>         *Defendants*. | Civil Action No. 4:25-cv-00036 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Zenwork, Inc. ("Zenwork") brings this suit against Defendants the United States Social Security Administration ("SSA") and Carolyn W. Colvin, in her official capacity as Acting Commissioner of Social Security, and alleges as follows:

**PRELIMINARY STATEMENT**

1.     Zenwork is a technology company that provides automated digital tax form submission solutions for businesses across the United States.

2.     For over a decade, Zenwork has partnered with SSA, the Internal Revenue Service ("IRS"), and other private firms in the accounting and tax space to facilitate wage report compliance for thousands of businesses.  Today, Zenwork is one of the largest e-file providers in

the country in many of the product verticals that it serves, including SSA Form W-2 and IRS forms including Form 1099, through Zenwork's website.

3.      In late August 2024, Zenwork identified that the SSA Forms W-2 it attempted to submit were not being processed in SSA's Business Services Online ("BSO").

4.      Whereas SSA's BSO usually responds to a Form W-2 submission with electronic processing confirmations that the submissions have been submitted, received, and accepted (or rejected, generally due to a problem with the file), SSA did not respond to the attempted submissions:  The Forms W-2 effectively went into a blackhole.

5.      Zenwork's efforts to resolve the issue with SSA failed, as SSA's technical support staff identified various technical issues that were, allegedly, on the cusp of being fixed.

6.      On November 4, 2024, SSA entirely disabled Zenwork's account with BSO, and Zenwork could not log in.

7.      Zenwork received a one-page letter on November 19, 2024 stating that SSA was suspending Zenwork's e-filing privileges because SSA "suspect[ed] fraud or misuse related to wage reports submitted to us." SSA stated that, "[w]e attempted to work with you on this issue, but it is not resolved."  SSA did not explain what, in particular, "this issue" was.

8.      The discussion of "suspected fraud" was equally confusing:  Zenwork has no incentive to permit third-party W-2 fraud by its customers, and Zenwork has zero tolerance for third-party tax fraud.  Indeed, offering products and services that are unacceptable to the federal government would be inimical to Zenwork's business strategy to offer a suite of best-in-class tax *compliance* solutions.  And customers pay Zenwork a per-Form-W-2 filing fee; Zenwork has no financial incentive to allow customers to falsify a Form W-2's *content*.

9.     SSA subsequently sent a letter to Zenwork's historical customers, including thousands of employers, informing them that Zenwork could not file Form W-2, and encouraged those customers to file through an alternative provider, *i.e.*, a competitor of Zenwork (or file themselves).

10.     SSA's letter set off a frantic effort to understand the basis for SSA's decision and obtain any available administrative process to restore Zenwork's e-filing access.  Zenwork engaged in near-daily contact with SSA, over the last two months, to try to understand the agency's decision and access *any* administrative process to appeal SSA's decision.

11.     This has included not just over 50 phone calls and emails to every level of SSA, and essentially every field office, but at least four in-person visits to its offices.

12.     For the most part, SSA failed to respond (the employees were largely on extended holiday leave), and employees that did answer said that Zenwork was facing a "technical issue" with its account that would soon be resolved.

13.     After weeks of fruitless efforts, SSA acknowledged that it had issued formal written instructions to SSA representatives not to communicate with Zenwork, and thus, not offer any appeal right.  Zenwork has never received *any* administrative process to either prevent or unwind SSA's suspension decision.

14.     Because federal law requires employers to file Forms W-2 by January 31, 2025, SSA's suspension decision has left Zenwork in limbo, persistently seeking redress from the government but unable to file Forms W-2 in January, the very heart of Form W-2 filing season, for its customers or even for its own employees.

15.    SSA's deprivation of Zenwork's ability to submit Forms W-2, one of its core business functions, poses an existential threat to Zenwork's reputation, finances, and ultimately its value as a going concern.

16.    SSA's suspension decision is unlawful.

17.    SSA's suspension decision relies entirely on its *November 19, 2024* letter.

18.    But, as it turned out, SSA suspended Zenwork's ability to successfully submit Forms W-2, without notice, in the last week of *August 2024*—essentially the administrative equivalent of a "shadow ban."

19.    SSA disabled Zenwork's account entirely on November 4, 2024, rendering it totally inaccessible.

20.    The Administrative Procedure Act ("APA") does not permit agencies to take adverse action in secret, then back-fill a written explanation weeks later.  *See DHS v. Regents of the Univ. of California*, 591 U.S. 1, 22 (2020).  "[P]ost hoc rationalizations"—i.e., explanations after the agency's decision—"cannot serve as a sufficient predicate for agency action."  *Id.* at 23; *see also R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) ("agency must defend its actions based on the reasons it gave when it acted").  That alone is fatal to SSA's decision.

21.    Even if the Court were to consider SSA's November 19, 2024 letter, its explanation of SSA's prior decision to suspend Zenwork's right to file Forms W-2 through BSO violates the APA, because it is both arbitrary and capricious and contrary to law.

22.    At the most basic level, SSA's November letter simply quotes SSA's website Terms of Service, then repeats that Zenwork violated those terms, without any details whatsoever of what "suspect[ed] fraud or misuse related to wage reports submitted to us" SSA was talking about.  That is not reasoned decision making.

23.     SSA's no-notice, no-opportunity-to-be-heard suspension decision violates the APA's procedural safeguards too.

24.     Unsurprisingly, SSA's governing statute grants no authority to unilaterally suspend a BSO user without prior notice or hearing, as SSA did here.

25.     Zenwork will suffer devastating and irreparable harm from SSA's action.

26.     Zenwork therefore brings this action to set aside and vacate SSA's unlawful decision to suspend Zenwork's right to submit Forms W-2 through SSA's BSO website.

27.     The Court should set aside SSA's unlawful decision to suspend Zenwork's right to submit Forms W-2 through SSA's BSO website.  It should grant injunctive relief SSA to reinstate Zenwork's access to its BSO account and to prohibit SSA from refusing to accept any Form W-2 on grounds that Zenwork made the submission.

## PARTIES

28.     Zenwork is a technology company that provides dependable and automated digital tax compliance solutions for businesses across the United States.  Zenwork is incorporated in Arkansas with its headquarters in Arkansas and principal places of business in Texas at 1600 Solana Blvd., Suite 8130, Westlake, Texas 76262, within Tarrant County. Zenwork's CEO, Chief Financial Officer, Controller, Chief Technology Officer, and a Board member have worked in Zenwork's Westlake, Texas, office for the past two years.  The Westlake office is the nerve center of the company.

29.     SSA is a department of the United States.  Its headquarters and principal place of business are at 6401 Security Blvd. Baltimore, MD 21235.  Its governmental activities occur nationwide.

30.    Carolyn W. Colvin is the Acting Commissioner of SSA.  In this capacity, Acting Commissioner Colvin has ultimate responsibility for activities at SSA, including the actions complained of herein.  Her governmental activities occur nationwide.

**JURISDICTION, VENUE, EXHAUSTION, AND FINAL AGENCY ACTION**

31.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701-706, and the United States Constitution.

32.    Zenwork's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1361.

33.    Venue is proper in this District under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because a substantial part of the acts or omissions giving rise to the claims occurred in Westlake (Tarrant County), Texas, where Zenwork's senior executive team, including its CEO, CFO, CTO, Controller, and other employees work, and where Zenwork maintains its principal place of business.

34.    There is no statutory or regulatory requirement for exhaustion of administrative remedies.  Thus, administrative exhaustion is not a prerequisite to suit.

35.    In any event, immediate judicial review is warranted for the very reason that Zenwork has already made exhaustive efforts to obtain relief from SSA to no avail.

36.    Zenwork has pursued all conceivable administrative remedies.  Specifically, between November 2024 and January 2025, Zenwork's employees and senior executives repeatedly reached out to SSA to try to determine why it had suspended Zenwork's right to file Forms W-2 through the BSO website and what Zenwork could do to access an administrative procedure restore that right.  This included in-person visits to multiple SSA offices and dozens of phone calls and emails to multiple SSA staff.  SSA did not offer any further procedure for

administrative relief, and ultimately explained that there was nothing Zenwork could do before the agency to obtain any form of administrative relief or review of SSA's decision.

37.    SSA's decision to suspend Zenwork's right to file Forms W-2 through the BSO website is final agency action subject to judicial review under 5 U.S.C. § 704.

## BACKGROUND

### A.    Social Security Administration Form W-2 And e-Filing

38.    Form W-2 (Wage and Tax Statement) is a joint SSA and IRS information reporting form by which employers report each employee's wages and tax withheld.

39.    Employers who pay for services performed by an employee generally must file with SSA a Form W-2 for each employee, for whom Income, Social Security, or Medicare tax was withheld.

40.    SSA has an inter-agency agreement with IRS to supply Forms W-2 submitted to SSA to IRS.  Federal law requires employers filing 10 or more W-2s, including Zenwork, to make those filings electronically on SSA's BSO website, rather than in paper form.  20 C.F.R. § 422.114(a); 26 C.F.R. § 301.6011-2(b)(2), (c); SSA, *Electronic W-2/W-2C Filing* 1 (Apr. 2024), www.ssa.gov/employer/bsoewrug.pdf.

41.    The consequence for failing to e-file is significant.  Filing a paper return when an electronic return is required "is deemed to have failed to file the return" and can subject employers to considerable civil penalties.  26 C.F.R. § 301.6011-2(f).

### B.    Zenwork's Longstanding E-Filing Business

42.    Given the technical complexity of Form W-2 submissions, to meet employers' filing obligations, SSA gives employers the "option to hire a [third] party to submit W-2s electronically    on    [their]    behalf."    SSA,    *Information    for    Taxpayers*,

https://www.ssa.gov/employer/taxpayer.html.    Zenwork provides those critical services for thousands of American businesses.

43.    Many entities participate in the filing flow for Forms W-2, such as accounting firms (which may provide Form W-2 submission services directly, and/or facilitate submission through a vendor like Zenwork), and payroll firms.

44.    Zenwork is part of this tax form submission ecosystem.  Since 2014, Zenwork has collaborated with SSA to facilitate Form W-2 submission for a diverse client base, including small and medium-sized businesses, accounting firms, and large enterprises.

45.    Unlike full-service accounting firms, Zenwork transmits tax forms based on data provided directly by third-party customers, but does not offer tax return or accountancy services pertaining to the underlying financial inputs.

46.    Zenwork does not generally keep other companies' books and records or provide tax return preparation services.

47.    In the context of Form W-2, Zenwork contracts with employers, accounting firms, payroll firms, and others to receive employers' raw payroll data, format that data in a manner required by SSA, and electronically submit that data to SSA in Form W-2.

48.    Zenwork has over 200 employees.  Its senior executive team, including its CEO, CFO, CTO, Controller, and others, work at Zenwork's office in Westlake, Texas (Tarrant County). The events described herein principally took place in Westlake.

**C.    Zenwork's Efforts To Combat Form W-2 Fraud**

49.    Because of the important federal function of Form W-2, there is a risk that bad actors utilize fraudulent Forms W-2 to misappropriate funds from the government and/or taxpayers, as IRS has documented.

8

50.     Among other types of W-2 scams, as IRS has correctly explained, a bad actor can falsify wages and withholding data on a fraudulent Form W-2 for a non-existent employee to try and seek a refund of such falsified excessive withholding from IRS.

51.     Although there is no assured method to identify fraudulent data inputs to Forms W-2, and neither SSA nor IRS has promulgated rules or procedures for submitters such as Zenwork to validate or reject Forms W-2, Zenwork employs multiple systems to deter, detect, remediate, and report suspected fraud to the government, and block users associated with such suspected fraud.

52.     Zenwork has repeatedly and successfully engaged with regulators, including SSA, IRS, and the various States, to identify, investigate, block, and remediate accounts potentially engaged in Form W-2 fraud.

53.     Pursuant to these controls, Zenwork has proactively blocked hundreds of users, prior to receiving government outreach about them.

**D.     July 2024 Engagement With SSA**

54.     On July 15, 2024, Zenwork's CEO, Sanjeev Singh, received an email from SSA's Jeff Warder, Employer Services Liaison Officer, Kansas City Region, stating:  "I need to speak to you as soon as possible regarding suspicious submissions coming from your account. . . . If I don't hear from you very soon, we may be forced to suspend access again [as briefly occurred in 2023]."

55.     Mr. Warder's last sentence apparently referred to a previous interaction with him in September and October 2023, when Zenwork *successfully* aided him in investigating and blocking a single customer of Zenwork's that was potentially engaged in fraud.

56.    On July 16, 2024, Zenwork's CEO spoke with Mr. Warder about six specific customers, all of which Zenwork had already blocked in May 2024 following outreach from the Montana and Maryland Departments of Revenue.

57.    Zenwork nonetheless attempted to contact these six customers to discuss their accounts and obtain further details, but was unsuccessful.

**E.    SSA's August 2024 Suspension of Zenwork's W-2 Submission Rights**

58.    Beginning on or about August 26, 2024, Zenwork attempted to submit, over a period of time, approximately 8,000 files for Form W-2 through its BSO account.

59.    Although Zenwork accessed the BSO system, contrary to the system's normal behavior, Zenwork's attempted post-August 2024 submissions did not result in any confirmation that the Forms W-2 had been submitted, received, accepted, or rejected.  The filings, effectively, disappeared.

60.    During September and October 2024, Zenwork, including its CEO, repeatedly reached out to SSA BSO technical support and Mr. Warder regarding Zenwork's inability to submit Forms W-2, but it did not receive an answer.

61.    Technical support stated, variously, that there were technical issues with Zenwork's account, that the issues either had been or were in the process of being corrected, or, alternatively, that there was no issue with the account.

62.    Zenwork checked if other similarly situated firms were experiencing similar issues, but did not identify any.  These issues persisted for over a month.

63.    On November 4, 2024, SSA entirely disabled Zenwork's BSO account.

**F.    SSA's November 2024 Letter**

64.    SSA sent a letter to Zenwork on November 19, 2024, stating, "We are writing to tell you that we have indefinitely suspended you from submitting electronic annual wage reports to the [SSA], effective November 19, 2024."

65.    SSA's reasoning, in full, was that: "When logging in to use [BSO], you agreed to our General Terms of Service that states, 'I understand that the Social Security Administration may stop me from using Social Security online services if it finds or suspects fraud or misuse'. We suspect fraud or misuse related to wage reports submitted to us.  We attempted to work with you on this issue, but it is not resolved.  We are suspending your access to BSO, which includes the ability to submit electronic wage reports."

66.    On December 5, 2024, SSA sent notices to thousands of entities it identified who may have used Zenwork products to submit wage reports to SSA.  The notice informed these entities that SSA would no longer accept wage reports from Zenwork and encouraged them to use alternative Form W-2 submission methods, *i.e.*, registering with BSO and submitting forms to SSA directly or using a Zenwork competitor.

67.    Zenwork did not learn of the letters until after they were sent, when customers began reaching out.

**G.    November 2024 to Present Communications With SSA**

68.    Between November 19, 2024 and present, Zenwork engaged in over 50 attempted contacts with SSA employees, including dozens of emails, dozens of phone calls, and four visits to SSA offices, to attempt to understand why Zenwork's SSA BSO account had been suspended, and to try to access some post-deprivation administrative process to challenge SSA's suspension decision.

69.     For the most part, SSA did not answer its phones and emails (employees were largely on extended holiday leave in December and January), and several employees who did represented that Zenwork was facing a "technical issue" that would soon be resolved.

70.     After weeks of fruitless efforts, SSA acknowledged in January 2025 that it had circulated written instructions to SSA representatives not to communicate with Zenwork at all regarding this matter.

71.     On January 8, 2025, Zenwork's counsel engaged SSA's counsel on this matter through a written letter requesting to confer with the agency.

72.     To date, SSA has refused to identify the grounds for the suspension beyond those stated in SSA's November 19, 2024 letter and refused afford Zenwork any form of administrative process regarding the suspension decision.

### CLAIM I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
**SSA's Decision to Suspend Zenwork's Right to Submit Forms W-2 Through BSO Is Arbitrary And Capricious Violation of 5 U.S.C. § 706**

73.     The foregoing paragraphs are incorporated by reference as if set forth in full herein.

74.     The APA prohibits Defendants from acting in any way that is arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C).

75.     SSA's decision to suspend Zenwork's right to submit Forms W-2 through BSO, without sufficiently explaining or justifying its decision and without notice or an opportunity to be heard, is arbitrary and capricious.

76.     SSA's November 2024 post-hoc explanation cannot justify SSA's August 2024 suspension decision.

77.     SSA actually suspended Zenwork's right to file Forms W-2 through Zenwork's BSO account in August 2024.  SSA fully disabled Zenwork's BSO account login on November 4. SSA only provided a written explanation of its decision justifying the suspension on November

19, 2024. In the intervening weeks, SSA claimed in multiple conversations that Zenwork was facing unspecified technical issues (or no issue at all), when in fact its filing rights had been suspended in August 2024.

78.    SSA's August 2024 decision to suspend Zenwork's filing rights is impermissible under the APA's requirement of "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), which requires an agency to "articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

79.    It is not just that SSA did not provide a satisfactory explanation for suspending Zenwork's W-2 filing rights in August 2024: SSA acted in secret to suspend Zenwork's rights, and provided *no explanation* for that decision at the time. That alone falls short of the required "satisfactory explanation," because it is no explanation at all. *State Farm*, 463 U.S. at 43.

80.    To be sure, *after* Zenwork spent 1.5 months calling and writing to SSA to try to reinstate its filing rights, SSA apparently realized that it had not "papered" its suspension of Zenwork in writing and decided to issue a letter on November 19, 2024, identifying in a conclusory manner an alleged violation of the BSO's Terms of Service.

81.    But critically, SSA's explanation in its November 19, 2024 letter cannot justify its August 2024 suspension, because the explanation for a decision must come at the time the agency acts, and cannot be backfilled at a later time. "An agency must defend its actions based on the reasons it gave when it acted." *Regents*, 591 U.S. at 24. "[P]ost hoc rationalizations"—i.e., explanations given after the relevant decision—"cannot serve as a sufficient predicate for agency action." *Id.* at 23; *see also R.J. Reynolds*, 65 F.4th at 189 ("[An] agency must defend its actions based on the reasons it gave when it acted.").

82. Post-hoc explanations only serve to *reinforce* the irrationality of the agency's decision. *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022) ("[T]he fact that an agency provided a *post hoc* rationalization is relevant evidence that the action is arbitrary and capricious.").

83. Even if SSA could rely on its November 19, 2024 letter-explanation, SSA's decision to suspend Zenwork's Form W-2 filing rights is still arbitrary and capricious.

84. SSA's November 2024 letter—even if it did not come too late—fails to justify SSA's suspension decision consistent with the requirements of reasoned decisionmaking under the APA.

85. SSA's November 2024 decision must be set aside for the simple reason that it is wholly conclusory.

86. An agency must "articulate a satisfactory explanation for its action." *Univ. of Texas M.D. Anderson Cancer Center v. HHS*, 985 F.3d 472, 473 (5th Cir. 2021). But "conclusory statements . . . do not constitute adequate agency consideration." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024); *see also Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (explaining that "[t]he agency's statement" in informal adjudication "must be one of reasoning; it must not be just a conclusion" (internal quotations omitted)).

87. SSA's November 19, 2024 letter-explanation was just a conclusion.

88. SSA simply quoted the Terms of Service allowing SSA to suspend access when it "suspects fraud or misuse," concluded that it "suspects fraud or misuses." *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (rejecting explanation that "merely parrot[ted] the language of a statute"); *Aztec Gen. Agency v. FDIC*, 111 F.3d 893, at *1 (5th Cir. 1997) (unpublished) (holding agency erred where it "failed to provide any analysis"); *Permian Basin*

*Petroleum Ass'n v. DOI*, 127 F. Supp. 3d 700, 723 (W.D. Tex. 2015) ("cursory and conclusory" application of agency rules is arbitrary).

89.    "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019).  "If judicial review is to be more than an empty ritual, it must demand something better" than simply stating the asserted legal standard, of *suspected* fraud, and concluding it was violated. *Id.* at 2576.

90.    Moreover, SSA's barren conclusion is not a *reasoned* decision based on *record evidence.*  An agency's decision must be based on record evidence and the "record as a whole," *Ghassan v. INS*, 972 F.2d 631, 635 (5th Cir. 1992), yet SSA identified *zero* evidence supporting its decision, just a conclusion about something it subjectively "suspects."  That is not reasoned decisionmaking.

91.    SSA also failed to consider the important aspects of the problem.

92.    It is not possible to really discern the reasoning for SSA's conclusion.  The November letter references that SSA had "attempted to work with you on this issue, but it is not resolved."  Zenwork works with SSA all of the time, so it is not entirely clear what "issue" SSA is talking about.

93.    But if SSA means to refer to its engagement with Zenwork in July 2024 regarding *six* customers suspected of potential fraud, that *reinforces* the arbitrariness of SSA's decision.  SSA has never justified why its July 2024 investigation, with which Zenwork cooperated, of *possible* fraud by six unrelated third parties would remotely justify suspending *Zenwork* from filing for

thousands of other customers that SSA is *actively encouraging* in written communications to timely file their Forms W-2 with SSA prior to January 31, 2025, albeit, with a different provider.

94.    If SSA's November letter means to reference the July 2024 interactions, SSA failed to consider multiple "important aspect[s] of the problem," and failed to draw a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43.

95.    SSA provides zero explanation for why the fact that "[w]e attempted to work with you on this issue [for six customers], but it is not resolved," would justify suspending Zenwork's ability to file for thousands of unrelated third-parties who have no relationship to the six identified third parties.

96.    SSA also failed to consider less restrictive "'alternatives' that are 'within the ambit of existing policy.'" *Louisiana*, 90 F.4th at 476 (quoting *Regents*, 591 U.S. at 30).

97.    SSA also entirely failed to consider that the likely effect of its action will not aid its investigation against six customers—and at worst, is likely to hinder it.

98.    SSA has issued tens of thousands of copies of a public letter affirmatively encouraging Zenwork's customers to *continue to file* their Forms W-2 with SSA, but simply do so themselves, or through another provider besides Zenwork.

99.    But SSA's purported solution of requiring Zenwork's customers to file Forms W-2 through other means does not ameliorate the problem, it only disperses the problem more broadly.

100.    If SSA's real goal is to identify suspected fraud among Zenwork's customer base, it makes little sense to scatter those customers to the wind in the midst of providing their records as part of the January 2025 W-2 filing season.  That, again, fails to consider a "important aspect of the problem."  *State Farm*, 463 U.S. at 43.

**CLAIM II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**SSA's Decision to Suspend Zenwork's Right to Submit Forms W-2 Through BSO Is**
**Arbitrary And Capricious Violation of 5 U.S.C. § 706's Procedural Guarantees**

101.    SSA's procedural treatment of Zenwork also independently violated the APA.

102.    SSA inexplicably reversed course and suspended Zenwork without notice, even though Zenwork cooperated with SSA's July 2024 inquiries.

103.    Mr. Warder's July 15, 2024 email to Mr. Singh said that if he did not "hear from [Zenwork] very soon, [SSA] may be forced to suspend access again [as briefly occurred in July 2023]."

104.    But Mr. Warder *did* hear from Mr. Singh:  They spoke for over 15 minutes the next day about the six customers that Mr. Warder identified, and engaged in a multi-day email conversation.

105.    Zenwork had *already* blocked these customers' accounts prior to Mr. Warder's outreach, and disabled the last account after the call, which is what Mr. Warder had asked Zenwork to do with the account he flagged in July 2023.

106.    If SSA felt that more was needed, it could and should have followed up at some point in July or August.  SSA's "unexplained reversal"—suspending Zenwork even though it did exactly what SSA asked—violated the APA.  *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 322 (5th Cir. 2001).

107.    SSA also denied Zenwork adequate notice and an opportunity to be heard on the issue that led to Zenwork's suspension:  that Zenwork had "not resolved" the "suspected fraud or abuse."

108.    Because Zenwork had already addressed the issues Mr. Warder raised in July 2024 by responding to SSA's inquiries and by earlier blocking the accounts and because SSA had not

raised any new issues, the letter failed to give reasonable notice of the reason for Zenwork's suspension. And without notice, Zenwork could not address whatever concerns SSA had.

109. Zenwork has made clear that it would "rectify the situation" if only it knew what "the situation" was.

110. The APA required Zenwork "be informed of" and allowed to "comment upon the relevant evidence" on which SSA relied to suspend it. *Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 923 (D.C. Cir. 1982); *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092, 1099 (5th Cir. 1976). In contrast to the IRS procedures for e-filing suspensions, SSA did neither.

111. Defendants' decision to suspend Zenwork's right to submit Forms W-2 through BSO is arbitrary and capricious.

### CLAIM III: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### SSA's Decision to Suspend Zenwork's BSO Access Is Contrary To Law
### Violation of 5 U.S.C. § 706

112. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

113. The APA prohibits Defendants from acting in any way that is arbitrary and capricious or an abuse of discretion, or that is not in accordance with law, or that is in excess of statutory jurisdiction or authority or short of statutory right. 5 U.S.C. § 706(2)(A), (C).

114. SSA unilaterally suspended Zenwork's filing rights without prior notice or an opportunity to be heard. Unsurprisingly, SSA's governing statutes do not provide for such a unilateral suspension procedure. Indeed, SSA did not even *claim* its action was authorized by statute.

115. Rather, SSA's only source of purported "authority" for its suspension was not a statute, regulation, or policy, but rather website Terms of Service that Zenwork supposedly agreed to as a condition to its right to use the BSO e-filing system (or indeed, SSA websites more broadly).

116.    There are multiple problems with SSA's theory that it can adopt a unilateral sanction (no-notice-or-opportunity-to-be-heard suspension) by *contract* that Congress did not authorize by *statute*.

117.    First, and most fundamentally, agencies cannot end-run limitations on their statutory authority, or avoid acting by duly promulgated regulation, by unilaterally issuing adhesive "Terms of Service" that provide different penalties (like suspension) by contract that Congress has not chosen to prescribe, nor delegated to the agency authority to prescribe, by statute. *See New York v. FERC*, 535 U.S. 1, 18 (2002) (agencies "literally ha[ve] no power to act unless and until Congress confers power upon [them]").

118.    It is black-letter law that binding legal requirements ("legislative rules") must be issued with statutory authority and notice-and-comment, not agency fiat. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015). Here, Zenwork, both by virtue of its position as an intermediary *and* an employer of over 10 employees, *must* use BSO to e-file of Form W-2 under penalty of law, and *must* therefore agree to the BSO Terms of Service. *See* 26 C.F.R. § 301.6011-2(b)(2), (c).

119.    Agencies cannot impose new and additional sanctions in this manner, and SSA's suspension decision is therefore contrary to law on this basis alone.

120.    Moreover, even if SSA could issue binding, unilateral penalties by fiat (it cannot), SSA's Terms of Service do not actually authorize suspension in the circumstances here.

121.    The Terms of Service state, in pertinent part: "I understand that the Social Security Administration may stop me from using Social Security online services if it finds or suspects fraud or misuse."

122.    In effect, SSA has interpreted this contractual term to mean SSA may suspend users "if it finds or suspects fraud or misuse **by the user or the user's third party customers**." That is simply not a reasonable construction of the Terms' language.

123.    An ordinary English speaker would not understand that by providing that if SSA "finds or suspects fraud or misuse," the Terms of Service authorize SSA to suspend a firm's e-filing rights based on "fraud or misuse **by your customers**."

124.    For the foregoing reasons, Defendants' decision to suspend suspend Zenwork's right to submit Forms W-2 through BSO is contrary to law.

### CLAIM IV: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### SSA's Decision to Suspend Zenwork's BSO Access Was Issued Without Procedure Required By Law
### Violation of 5 U.S.C. § 706

125.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

126.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is undertaken "without observance of procedure required by law."   5 U.S.C. § 706(2)(D).

127.    For informal adjudication, 5 U.S.C. § 555(e) provides that an agency must give "[p]rompt notice" of any denial of any "request of an interested person made in connection with any agency proceeding."  "Although nothing more than a brief statement is necessary, the core requirement is that the agency explain why it chose to do what it did." *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quotations and citation omitted).

128.    SSA denied Zenwork's BSO access as part of its suspension proceedings without the proper notice required.  Such an adjudicative decision may not "simply parrot[] the words of

[a statute or regulation] without offering anything to explain why" such requirement applied to plaintiff. *Olivares v. TSA*, 819 F.3d 454, 463 (D.C. Cir. 2016).

129.    Zenwork also repeatedly and in writing requested information from SSA about its suspension proceedings and related investigation, but SSA did not provide a "prompt" response explaining the issue in any detail. When it finally responded after days of ignoring Zenwork, it just repeated the earlier notice justification, which was insufficient.

130.    Defendants' decision to suspend Zenwork's right to submit Forms W-2 through BSO was undertaken without observance of procedure required by law.

## CLAIM V: FIFTH AMENDMENT VIOLATION
### SSA's Decision to Suspend Zenwork's BSO Access Is a Violation of Its Due Process Rights under the Fifth Amendment of the U.S. Constitution (U.S. Const. amend. V)

131.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

132.    The Fifth Amendment to the United States Constitution guarantees a right to due process under the law. *United States v. Barcenas-Rumualdo*, 53 F.4th 859, 864 (5th Cir. 2022). Intrinsic to that right is the "federal constitutional guarantee of procedural due process." *Rutherford v. United States*, 702 F.2d 580, 583 (5th Cir. 1983). "At a minimum," procedural "due process requires that notice and an opportunity to be heard 'be granted at a meaningful time and in a meaningful manner.'" *Gibson v. Tex. Dep't of Ins. Div. of Workers' Comp.*, 700 F.3d 227, 239 (5th Cir. 2012) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).

133.    "Agency action shall be set aside if it is unlawful, 5 U.S.C. § 706, 'which of course includes unconstitutional action.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 459 (5th Cir. 2021) (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 516 (2009)).

134.    Defendants' decision to suspend Zenwork's right to submit Forms W-2 through BSO was done without the "notice and opportunity to be heard," for the reasons explained above.

135.    Accordingly, Zenwork is entitled to declaratory relief declaring that Defendants have violated Zenwork's Due Process rights and injunctive relief prohibiting enforcement by Defendants of the SSA's decision to suspend Zenwork's BSO access.

## PRAYER FOR RELIEF

WHEREFORE, Zenwork respectfully requests that this Court enter judgment in its favor and grant the following relief:

a.    A declaration pursuant to 28 U.S.C. § 2201 stating that:

    i.    SSA's 2024 decision to suspend Zenwork's right to submit Forms W-2 through BSO is contrary to law; and

    ii.    SSA's 2024 decision to suspend Zenwork's right to submit Forms W-2 through BSO is arbitrary and capricious.

b.    A stay of SSA's decision to suspend Zenwork's right to submit Forms W-2 through BSO.

c.    An order setting aside SSA's decision to suspend Zenwork's right to submit Forms W-2 through BSO.

d.    Temporary, preliminary, and permanent injunctive relief directing SSA to reinstate Zenwork's right to submit Forms W-2 through BSO.

e.    Temporary, preliminary, and permanent injunctive relief directing SSA to reinstate Zenwork's access to its BSO account.

f.    Temporary, preliminary, and permanent injunctive relief prohibiting SSA from refusing to accept any Form W-2 on grounds that Zenwork made the submission.

g.    An order permanently enjoining Defendants, and their officers, agents, employees, assigns, and all persons acting in concert or participating with them, from relying on SSA's 2024 suspension decision.

h.    An order awarding Zenwork its costs and attorneys' fees and expenses as allowed by law.

i.    Such other and further relief as the Court deems just and proper.

Dated:  January 16, 2025                    Respectfully submitted,

/s/ Benjamin J. Behrendt
Benjamin J. Behrendt (admitted, 24130704)
Nicholas L. Schlossman (pro hac vice pending)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel:  (737) 910-7300
Fax:  (737) 910-7301
Email:  benjamin.behrendt@lw.com
          nicholas.schlossman@lw.com

Andrew D. Prins (pro hac vice pending)
Brian C. McManus (pro hac vice pending)
Jonathan L. Williams (pro hac vice pending)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
          brian.mcmanus@lw.com
          jonathan.williams@lw.com

Josh O. Ungerman (admitted, 20393150)
Mary E. Wood (admitted, 24047137)
MEADOWS COLLIER
901 Main Street, Suite 3700
Dallas, TX 75202 901
Phone: (214) 744-3700
Fax: (214) 747-3732
Email:  jungerman@meadowscollier.com

mwood@meadowscollier.com

*Attorneys for Plaintiff Zenwork, Inc.*